No. 23-1096

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

**UNITED STATES OF AMERICA**

Plaintiff-Appellee,

vs.

**OLEGARIO LARES-DE LA ROSA,**

Defendant-Appellant.

---

On Appeal from the Judgment of the
United States District Court for the District of Arizona
D.Ct. No. 4:22-cr-00974-JGZ-JR

---

**OPENING BRIEF OF APPELLANT**

---

JON M. SANDS
Federal Public Defender
District of Arizona

M. EDITH CUNNINGHAM
Assistant Federal Public Defender
407 W. Congress, Suite 501
Tucson, AZ 85701
Telephone: (520) 879-7500
Facsimile: (520) 879-7600
edie_cunningham@fd.org
*Attorneys for Mr. Lares-De La Rosa*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................... iii

STATEMENT OF JURISDICTION AND CUSTODY STATUS ................ 1

STATEMENT OF THE ISSUES ....................................................... 2

INTRODUCTION ........................................................................ 3

STATEMENT OF THE CASE ......................................................... 3

    A. The Kidnapping ............................................................... 3
    B. Negotiations for Ransom Payment ..................................... 6
    C. Lares's transport of Portillo and Perez ............................. 9
    D. Meet-up and Exchange ................................................... 10
    E. Arrest of Borboa and Lares .......................................... 13
    F. Indictment and Changes of Plea ..................................... 15
    G. Trial Testimony ........................................................... 17
    H. Jury Instructions ......................................................... 20
    I.  Closing Arguments and Verdict ..................................... 21
    J.  Sentencing ................................................................... 23

SUMMARY OF THE ARGUMENT

I.    Misleading Jury Instruction on Conspiracy to Hostage Take ........... 24
II.   Improper Opinion Testimony .......................................... 24
III.  Unconstitutional Prohibited Possession Conviction ......................... 25
IV.  Use of Acquitted Conduct at Sentencing ........................................... 25

ARGUMENT

I.    Lares's conviction for conspiracy to hostage take should be reversed
    because the district court's jury instruction on this offense was
    misleading and inadequate to guide the jury's deliberations ............ 26

    *Material Facts* ...................................................................... 26

i

*Standard of Review* .............................................................. 28

    A.    The instruction did not convey the government's obligation to prove that Lares knew that hostage taking was the object of the conspiracy he joined, rather than merely making a profit through alien transportation .................................................... 29

    B.    The plainly erroneous jury instruction prejudiced Lares ........ 36

II.    The district court's erroneous rulings on Agent Gomez's lay opinion testimony and its failure to give a multiple-role instruction to guide the jury's consideration of that testimony require reversal of the conspiracy-to-hostage-take conviction ............................................... 37

    *Material Facts* ...................................................................... 37

    *Legal Standards* ................................................................... 39

    A.    Agent Gomez provided opinions lacking in foundation that improperly told the jury to view the evidence in keeping with the government's theory of the case ........................................ 44

    B.    The errors prejudiced Lares .................................................... 47

III.    Lares's conviction for prohibited possession by a felon must be vacated because the statute is unconstitutional ................................. 49

IV.    Remand for resentencing is required because the district court imposed sentencing enhancements based on acquitted conduct ....... 52

CONCLUSION ......................................................... 54

STATEMENT OF RELATED CASES ...................................... 55

CERTIFICATE OF COMPLIANCE ........................................ 56

# TABLE OF AUTHORITIES

**CASES**                                                        **Page(s)**

*Class v. United States*,
  583 U.S. 174 (2018) ................................................................. 49

*Cupp v. Naughten*,
  414 U.S. 141 (1973) ................................................................. 30

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ................................................................. 40

*Estelle v. McGuire*,
  502 U.S. 62 (1991) ................................................................... 30

*In re Winship*,
  397 U.S. 358 (1970) ................................................................. 29

*Ingram v. United States*,
  360 U.S. 672 (1959) ................................................................. 30

*Johnson v. Texas*,
  509 U.S. 350 (1993) ................................................................. 30

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ................................................................. 40

*Medley v. Runnels*,
  506 F.3d 857 (9th Cir. 2007) ................................................... 29

*Middleton v. McNeil*,
  541 U.S. 433 (2004) ................................................................. 30

*New York Rifle & Pistol Assn. v. Bruen*,
  142 S. Ct. 2111 ................................................................. 50, 51

*Range v. Att'y General of the U.S.*,
  69 F.4th 96 (3d Cir. 2023) ................................................. 51, 52

iii

*S. Union Co. v. United States*,
   567 U.S. 343 (2012) ................................................................... 53

*Scott v. Sears, Roebuck & Co.*,
   789 F.2d 1052 (4th Cir. 1986) ............................................ 40

*United States v. Alahmedalabdaloklah*,
   76 F.4th 1183 (9th Cir. 2023) ............................................ 53

*United States v. Bear*,
   439 F.3d 565 (9th Cir. 2006) ...............................28, 29, 37

*United States v. Brooksby*,
   668 F.2d 1102 (9th Cir. 1982) ............................................ 30

*United States v. Bullock*,
   No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309
   (S.D. Miss. June 28, 2023) ................................................. 52

*United States v. Dicker*,
   853 F.2d 1103 (3d Cir. 1988) ............................................ 40

*United States v. Dixon*,
   201 F.3d 1223 (9th Cir. 2000) ............................................ 30

*United States v. Esparza*,
   791 F.3d 1067, 1074 (9th Cir. 2015) ................................ 49

*United States v. Federico*,
   658 F.2d 1337 (9th Cir. 1981) ............................................ 31

*United States v. Finley*,
   301 F.3d 1000 (9th Cir. 2002) ............................................ 40

*United States v. Kevin Freeman*,
   498 F.3d 893 (9th Cir. 2007) .................... 39, 40, 41, 43, 46

*United States v. Marcus Freeman*,
   730 F.3d 590 (6th Cir. 2013) ...................... 41, 45, 46

iv

*United States v. Gadson*,
    763 F.3d 1189 (9th Cir. 2014) ....................................41, 42, 43, 45, 46, 49

*United States v. Grasso*,
    724 F.3d 1077 (9th Cir. 2013) ........................................................... 31, 32

*United States v. Grinage*,
    390 F.3d 746 (2d Cir. 2004).........................................................42, 43, 46

*United States v. Hampton*,
    718 F.3d 978 (D.C. Cir. 2013) ....................................................42, 43, 45

*United States v. Holguin*,
    51 F. 4th 841 (9th Cir. 2022) ............................................................ 43, 45

*United States v. Joseph*,
    716 F.3d 1273 (9th Cir. 2013) .......................................................... 29, 37

*United States v. Kaplan*,
    836 F.3d 1199 (9th Cir. 2016) ................................................................. 30

*United States v. Krasovich*,
    819 F.2d 253 (9th Cir. 1987)................................................................... 31

*United States v. Mercado*,
    474 F.3d 654 (9th Cir. 2007)................................................................... 54

*United States v. Meyers*,
    847 F.2d 1408 (9th Cir. 1988) ................................................................ 31

*United States v. Ornelas*,
    906 F.3d 1138 (9th Cir. 2018) ....................................................29, 37, 48

*United States v. Peoples*,
    250 F.3d 630 (8th Cir. 2001)..........................................................43, 46

*United States v. Prince*,
No. 22 CR 240, 2023 WL 7220127 (N.D. Ill. Nov. 2, 2023) .................. 50

*United States v. Rodriguez*,
971 F.3d 1005 (9th Cir. 2020) ........................................ 43, 47

*United States v. Rollins*,
544 F.3d 820 (7th Cir. 2008) ............................................. 49

*United States v. Sandoval–Gonzalez*,
642 F.3d 717 (9th Cir. 2011) ............................................. 48

*United States v. Tham*,
960 F.2d 1391 (9th Cir. 1991) ............................................ 31

*United States v. Vera*,
770 F.3d 1232 (9th Cir. 2014) ........................................ 43, 47

*United States v. Warren*,
5 F.4th 1078 (9th Cir. 2021) ............................................. 31

*United States v. Watts*,
519 U.S. 148 (1997) ..................................................... 54

*Yeager v. United States*,
557 U.S. 110 (2009) ..................................................... 53

## STATUTES

18 U.S.C. § 1203(a) .................................................. 1, 26
18 U.S.C. § 1324(a)(1)(A) ................................................. 1
18 U.S.C. § 3231 .......................................................... 1
18 U.S.C. § 3742(a) ....................................................... 1
18 U.S.C. § 922(g)(1) ............................... 1, 2, 16, 25, 49, 51, 52
18 U.S.C. § 922(g)(5)(A) ................................................. 16
28 U.S.C. § 1291 .......................................................... 1
28 U.S.C. § 1294(1) ....................................................... 1

vi

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. II ................................................................ 50, 51
U.S. Const. amend. VI ............................................................. 25, 53

## RULES

Fed. R. Evid. 403 ..................................................................... 40, 46
Fed. R. Evid. 701 ............................................... 25, 40, 41, 46, 49
Fed. R. Evid. 702 ..................................................................... 40, 41

## SENTENCING GUIDELINES

U.S.S.G. § 2A4.1(b)(1) .................................................................. 53
U.S.S.G. § 3D1.4............................................................................ 52
U.S.S.G. Sentencing Table (2018) ............................................... 53

## OTHER AUTHORITIES

Ninth Circuit Model Criminal Jury Instruction 3.15 (March 2023) ............. 43

## STATEMENT OF JURISDICTION AND CUSTODY STATUS

The footnotes in this brief contain only record citations.

Appellant Olegario Lares-De La Rosa (Lares) is currently in Bureau of Prisons' custody serving the 216-month prison term imposed on June 2, 2023, after his federal convictions for conspiracy to hostage take under 18 U.S.C. § 1203(a) (count one); conspiracy to transport aliens for profit under 18 U.S.C. § 1324(a)(1)(A) (count 4); transportation of aliens for profit under 18 U.S.C. § 1324(a)(1)(A) (counts five and six); and illegal possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1) (count seven).[1]

The District Court for the District of Arizona had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. §§ 1291 & 1294(1). Lares timely filed his Notice of Appeal on June 6, 2023.[2]

---

[1] 5-ER-931.
[2] 5-ER-939.

1

# STATEMENT OF THE ISSUES

I. Should this Court reverse Lares's conviction for conspiracy to hostage take because the district court's instruction failed to inform the jury that, in order to convict, it must find that he knew of the conspiracy to hostage take and intended to help accomplish hostage taking?

II. Do the district court's erroneous rulings on Agent Gomez's lay opinion testimony and its failure to give a multiple-role instruction to guide the jury's consideration of that testimony require reversal of the conspiracy-to hostage-take conviction?

III. Must this Court vacate Lares's conviction for prohibited possession by a felon because 18 U.S.C. § 922(g)(1) is unconstitutional, both facially and as applied to Lares?

IV. Is remand for resentencing required because the district court imposed sentencing enhancements based on acquitted conduct?

## INTRODUCTION

Lares was indicted with his codefendants Ivan Borboa-Ruiz (Borboa) and Julio Rodriguez-Rojas (Rodriguez) on charges of conspiracy to hostage take, hostage taking, conspiracy to transport aliens for profit, and transportation of aliens for profit. Borboa and Lares were also charged with illegal possession of a firearm. Lares pleaded guilty to illegally possessing a firearm and, at a later trial, conceded his guilt on the alien-transportation charges. He, however, maintained that he had no involvement in hostage taking or conspiring to do so.

At trial, the district court improperly permitted the jury to consider Agent Juan Gomez's interpretation of certain text messages between Lares and Rodriguez. The jury convicted Lares of conspiracy to hostage take, but the district court's instruction erroneously failed to convey that such a conviction required proof that Lares knew of the conspiracy to hostage take and intended to help accomplish the hostage taking. The jury acquitted Lares of hostage taking, including on an aiding and abetting theory. Consistent with the trial evidence and Lares's concession, the jury convicted him on the alien-transportation charges.

## STATEMENT OF THE CASE

### A.    The Kidnapping

In March 2022, Jorge Portillo-Morales (Portillo), and his cousin Daniel Perez-Morales (Perez), both from Veracruz, Mexico, made arrangements with a

3

smuggling organization to cross into the United States and travel to New York.[3] They had asked their cousin in New York, Pablo Alvarado, for (presumably financial) help crossing and making it to their destination.[4] They traveled on their own to Sonora, Mexico, where they were picked up from the bus station by the organization's operative and taken to a house.[5] The cousins stayed in the house with about 40 other people for about two weeks.[6] Finally, a guide led them and seven others across the U.S./Mexico border through the Arizona desert.[7] The group, which totaled ten including the guide, walked through the desert for four days.[8]

The last night, three men dressed in camouflage—who turned out to be kidnappers—chased the group, and everyone ran and hid in the bushes.[9] The men yelled in loud voices to come out.[10] Six members of the group, including the cousins Portillo and Perez, revealed themselves, but the guide and the other two men in their original group were gone.[11] The three kidnappers told the six migrants

---

[3] 4-ER-697-98.
[4] 4-ER-698.
[5] 4-ER-697-99.
[6] 4-ER-699.
[7] 4-ER-699-701.
[8] 4-ER-701.
[9] 4-ER-703-05.
[10] 4-ER-705.
[11] 4-ER-704-05.

to kneel down and not move or they would be killed.[12] When Portillo refused to give his name, one of the men kicked him in the side of the face, causing him to fall.[13] The three men took the migrants' cell phones and identification papers and told them to get up and start moving.[14] They said they would help the migrants get through the desert and make it to their final destination.[15] During a rest break, one of the kidnappers left, and the other two kidnappers led the migrants to a hiding place to wait for a ride, under the kidnappers' watch.[16]

Soon, an enclosed truck picked them up and took them to a house.[17] That occurred on Sunday, April 3, 2022.[18] They stayed at the house for five days.[19] During the day, the migrants stayed in a small room in the house.[20] A tall, elderly man would give them food, but not much.[21] At night, they were taken to a room or shed to the side of the house to sleep on the floor.[22] They could not leave, because the doors were locked behind them.[23]

---

[12] 4-ER-707.
[13] 4-ER-708.
[14] 4-ER-709-10.
[15] 4-ER-710.
[16] 4-ER-712.
[17] 4-ER-712-13.
[18] 4-ER-720.
[19] 4-ER-720.
[20] 4-ER-713.
[21] 4-ER-714.
[22] 4-ER-714.
[23] 4-ER-720.

Another younger, tall man would come to the house to see the migrants.[24] This man would give them their cell phones to call family members.[25] During the course of the week, Portillo called Alvarado, the cousin in New York who had agreed to help him and Perez.[26] He told Alvarado they were fine, but they were no longer with their original group.[27] Portillo saw others in the group make calls to family members as well.[28] As the week went on, the other migrants left, as their families paid the demanded ransom.[29] By the afternoon of Friday, April 8, Portillo and Perez were the only ones left at the house.[30]

## B.    Negotiations for Ransom Payment

When Alvarado received a call from Portillo's phone on April 5, a male voice said he was calling on behalf of Alvarado's cousins in Tucson and asked him for $16,000 for their release.[31] Alvarado could hear his cousins in the background asking him to give the money and promising to repay him when they arrived in New York.[32] Alvarado did not have the means to raise $16,000, so he decided to

---

[24] 4-ER-715.
[25] 4-ER-715.
[26] 4-ER-718.
[27] 4-ER-718.
[28] 4-ER-720.
[29] 4-ER-722.
[30] 4-ER-722.
[31] 5-ER-761.
[32] 5-ER-760-61.

alert law enforcement.[33] He called the Homeland Security Investigations tipline and reported that someone in Tucson was demanding $16,000 for the release of his cousins.[34] Alvarado said that the man demanding ransom provided a Mexican contact number and an Arizona number in area code 602 ("602" number).[35] Law enforcement later identified the 602 number as belonging to Lares's codefendant, Borboa.[36]

Special Agent Angel Hernandez reached out to Alvarado on April 7 and advised him to record as many calls as possible with the suspect.[37] To buy time, he also advised Alvarado to request bank account numbers from the suspect to deposit the $16,000 because he could not personally deliver the money.[38]

Alvarado always talked to the same suspect about the ransom demand and logistics.[39] They spoke about 15 times.[40] Although unknown at the time, Alvarado was speaking to Borboa.[41] During the same time period, Borboa was also making and receiving calls to and from individuals in various other states and Mexico.[42]

---

[33] 5-ER-761-65.
[34] 5-ER-765; 2-ER-175-76.
[35] 2-ER-177-78.
[36] 4-ER-508-17.
[37] 2-ER-208, 213.
[38] 5-ER-768.
[39] 5-ER-767.
[40] 5-ER-773.
[41] 4-ER-508-17.
[42] 4-ER-507-17.

7

During one of these calls, Borboa provided Alvarado with bank account and routing numbers purportedly belonging to Kassandra Lopez and Odali Ayon.[43] Investigation later revealed that Appellant Lares had obtained bank account information for Ayon and Lizbeth Miranda, but not for Lopez, and provided it to codefendant Rodriguez on April 7.[44] Investigation also revealed that Lopez was Rodriguez's wife.[45] Miranda and Ayon appear to have had no further involvement.

On Friday, April 8, Agent Hernandez asked Alvarado if law enforcement could pose as a family friend who could bring the money in exchange for the release of his cousins.[46] Alvarado agreed, and he called Borboa on the 602 number to let him know that a family friend would be in touch.[47] Agent Hernandez (posing as that friend) called Borboa and asked if they could make the exchange once he had the money ready.[48] Borboa agreed and also let Hernandez speak to Portillo and Perez.[49] The special operations team then worked on selecting a location for the exchange and ultimately decided on a Home Depot parking lot on Costco Drive, in northwest Tucson.[50]

---

[43] 5-ER-770-71.
[44] 5-ER-900.
[45] 4-ER-518.
[46] 2-ER-214.
[47] 2-ER-216, 5-ER-776-77.
[48] 2-ER-217.
[49] 2-ER-218-21.
[50] 2-ER-146-47.

On April 7, law enforcement requested "ping" information on the 602 number and received updates every 15 minutes.[51] The phone was first located in Tempe, which is near Phoenix, and then it headed south until it was detected near downtown Tucson about midnight, at which point the pings stopped.[52] The next morning, April 8, the pings started on Hualpai Road, near downtown Tucson, and remained there until about 2 p.m. when the phone headed back north to Tempe.[53] The phone headed back south towards Tucson at about 4 p.m.[54]

## C.  Lares's transport of Portillo and Perez

Lares picked up Portillo and Perez on the afternoon of Friday, April 8.[55] Investigation later revealed that Rodriguez called Lares a few times throughout that day.[56] The elderly man told the cousins that it was time to go, and a black Hyundai sedan was parked on the street.[57] The driver, Lares, who was wearing a sun hat and a face mask, asked where they were going.[58] This was the first time Portillo and Perez had seen Lares.[59] When they said they were headed to New York, Lares said

---

[51] 3-ER-436-37.
[52] 3-ER-439.
[53] 3-ER-440.
[54] 3-ER-442.
[55] 4-ER-723.
[56] 3-ER-486-88.
[57] 4-ER-724-25.
[58] 4-ER-725-26.
[59] 4-ER-734-35.

9

he was not taking them there but to meet up with some other people.[60] Portillo and Perez were excited to leave the house.[61] Lares drove for about 30 minutes and parked near the Home Depot.[62]

### D. Meet-up and Exchange

Agent Hernandez, posing as Alvarado's friend, arrived at the Home Depot in a blue Dodge Ram with another undercover agent on the afternoon of Friday, April 8 and waited for about two hours; they had $16,000 in cash to use in the exchange.[63] Other members of the response team, including air support, were stationed nearby.[64] Agent Hernandez received updates from team members about Borboa's location based on pings from the 602 number.[65] Agent Hernandez talked to Borboa at least twice as Borboa made his way to the Home Depot.[66] At one point he could hear someone else talking in the background.[67] Borboa said he wanted to meet in the Home Depot's bathroom to take the money, but Agent Hernandez said he wanted to meet in his vehicle because he wanted to see proof that Portillo and Perez were alive.[68] Investigators later learned from video footage

---

[60] 4-ER-725.
[61] 4-ER-726.
[62] 4-ER-727.
[63] 2-ER-228-29.
[64] 3-ER-356-61.
[65] 2-ER-230.
[66] 2-ER-229-32.
[67] 2-ER-232.
[68] 2-ER-234, 237.

and further investigation that Borboa arrived at the Home Depot in a black Ford truck with Rodriguez.[69] Investigation later revealed that this truck was registered to Rodriguez's wife Lopez.[70]

Soon after that call, Borboa, who was wearing a surgical mask and was talking on the phone, approached the blue Ram.[71] Agent Hernandez and Borboa shook hands outside the car and then got in to exchange the money.[72] Agent Hernandez handed the bag of cash to Borboa, who began counting it and made a call to let someone know he was in the blue Ram.[73]

While Borboa was counting the money, Hernandez saw a man wearing a surgical mask and a camouflage "boonie hat" (which covers the sides of the face) looking around the vehicles in the parking lot.[74] Although unknown at the time, this man was Lares. A few minutes later, Agent Hernandez noticed a black Hyundai sedan arrived nearby; the driver appeared to be Lares, and two others were in the car.[75] Investigation later revealed that this Hyundai was registered to

---

[69] 3-ER-311-13, 460-61.
[70] 4-ER-519.
[71] 2-ER-237.
[72] 2-ER-238.
[73] 2-ER-240.
[74] 3-ER-254-55.
[75] 3-ER-256-57.

11

Borboa's girlfriend.[76] Once Borboa was satisfied the money was all there, he made a call and let someone know.[77]

Meanwhile, Lares got out of the black Hyundai for a phone call, but Portillo and Perez stayed in the car; they didn't leave because they were happy that Lares was about to turn them over to other people.[78] Lares never threatened or restrained them in any way, and they never saw a gun.[79] After Lares got off the phone, he gave them their cell phones and told them to walk to the blue Dodge Ram.[80]

Agent Hernandez soon saw Portillo and Perez (whom he recognized from pictures provided by Alvarado) get out of the black Hyundai sedan.[81] Borboa also told Agent Hernandez they were on their way.[82] Portillo and Perez got in the blue Ram as Borboa got out and started walking in the direction of both the black Hyundai and the black Ford truck, although Agent Hernandez was not aware of the black truck at the time.[83] The agents later learned through investigation that Borboa had called Rodriguez while in the blue Ram, and Rodriguez had in turn called Lares.[84] Lares later admitted calling someone he knew as "Moreno" to let him

---

[76] 2-ER-189.
[77] 2-ER-241, 3-ER-262.
[78] 4-ER-727-28.
[79] 4-ER-735-37, 739-40.
[80] 4-ER-728.
[81] 3-ER-260, 262.
[82] 3-ER-262.
[83] 3-ER-264, 311-13, 383.
[84] 3-ER-490.

know he had arrived at the Home Depot and then receiving a call from Moreno instructing him to tell Portillo and Perez to go to the blue Dodge Ram.[85]

## E.     Arrest of Borboa and Lares

Shortly after Borboa left the blue Ram, he was taken to the ground and arrested by agents waiting nearby.[86] This takedown caused a commotion, as agents activated sirens and flash bangs.[87] Borboa had a gun on his person, which agents confiscated, along with two cell phones (the 602 number and a 520 number ending in xx71) and a wallet.[88] His wallet contained an identification card bearing Rodriguez's name.[89] Subsequent investigation revealed an address on Hualpai Road associated with Rodriguez, and agents later saw the black Ford truck in which Borboa had arrived at the Home Depot parked at that address.[90] Although agents interviewed Rodriguez shortly after the incident and obtained his cell phone number (a 520 number ending in xx10),[91] he was not arrested and remained at large until recently.[92]

---

[85] 5-ER-907, 909-11.
[86] 3-ER-265.
[87] 3-ER-265, 295.
[88] 3-ER-453, 459.
[89] 3-ER-270.
[90] 3-ER-460-461.
[91] 3-ER-481.
[92] 5-ER-936.

13

During the commotion surrounding Borboa's takedown, Lares fled the Home Depot parking lot in the black Hyundai sedan.[93] With law enforcement in pursuit, he drove to a nearby shopping complex, made a loop around that complex, and then abandoned the car on foot.[94] He ran down a wash (a dry riverbed) and into a residential neighborhood, where he was finally apprehended.[95] An unloaded gun with an attached, loaded magazine was found near where Lares abandoned the black Hyundai.[96] Lares's cell phone, a 520 number ending in xx58[97] that appeared to have been recently used, was found on the driver's seat.[98] Two other phones were found in the Hyundai after an inventory search, one in the center console and one in the glove compartment.[99]

Subsequent investigation revealed that Rodriguez's wife Lopez had sold the black Hyundai sedan to Borboa.[100] Agents also learned that, next to Lopez's, Borboa's phone number was the one most associated with Rodriguez's.[101] Borboa called or texted Rodriguez 345 times between February 20, 2022 and April 8,

---

[93] 3-ER-291.
[94] 3-ER-326-29.
[95] 3-ER-329-31.
[96] 3-ER-398-99.
[97] 3-ER-484.
[98] 3-ER-418.
[99] 3-ER-453.
[100] 4-ER-531.
[101] 4-ER-524-25.

14

2022.[102] No phone number associated with Lares was among Rodriguez's ten most contacted numbers.[103]

But investigators did learn of the calls on April 7 between Rodriguez and Lares concerning the bank-account information of Ayon and Miranda.[104] (Ayon's account information was provided to Alvarado by Borboa, along with that of Rodriguez's wife Lopez). *See* p. 8, *supra.* In the calls with Rodriguez, Lares apparently discussed his involvement in transporting undocumented migrants.[105] In the midst of such a discussion on March 29, Rodriguez said "we're inviting ourselves."[106] In another discussion on April 6, Lares told Rodriguez that he woke up with an unbearable headache and was hoarse and coughing.[107]

## F.    Indictment and Changes of Plea

Lares and Borboa were indicted on charges of conspiracy to hostage take (count one), hostage taking (counts two and three), conspiracy to transport aliens for profit (count four), and transportation of aliens for profit (counts five and six).[108] A superseding indictment charged Rodriguez with counts one through six

---

[102] 4-ER-526.
[103] 4-ER-529.
[104] 4-ER-568-71; 5-ER-898-902.
[105] 5-ER-892-94.
[106] 5-ER-893.
[107] 5-ER-898, 900.
[108] 2-ER-060.

as a redacted defendant, because he was still at large.[109] Following his arrest in late

November 2023, his indictment became public.[110] Lares was also charged in count

seven with knowingly possessing a firearm knowing that he had been convicted of

a felony, and Borboa was also charged with knowingly possessing a firearm

knowing he was unlawfully present in the United States.[111] (Count seven

mistakenly cited 18 U.S.C. § 922(g)(5)(A) instead of § 922(g)(1). Lares later

agreed to an oral amendment of the indictment.[112])

Before trial, Lares pleaded guilty to the firearm count.[113] Borboa pleaded

guilty to conspiracy to hostage take and prohibited possession of a firearm under a

plea agreement.[114] The government offered Lares a plea agreement to the same

charges with a stipulated sentence of 180 months, and later offered another with a

stipulated sentence of 200 months, but he rejected both.[115] Although he took

responsibility for transporting illegal aliens for profit and conspiring to do so, he

adamantly denied being involved in hostage taking.[116]

---

[109] 2-ER-079.
[110] 5-ER-936, 938.
[111] 2-ER-060; 2-ER-079.
[112] 2-ER-068-69.
[113] 2-ER-075-76.
[114] 5-ER-927.
[115] 2-ER-084-86.
[116] 1-ER-037, 043-45.

G.    **Trial Testimony**

At trial, Alvarado, Portillo, and several agents involved in the April 8 sting and related investigation testified to the facts recounted above.

Agent Juan Gomez, a Spanish speaker, became a co-case agent after the April 8 sting to assist with the investigation.[117] He testified to factual matters and also expressed lay and expert opinions.

For example, as a fact witness, Agent Gomez described the text messages between Rodriguez and Lares in the days leading up to April 8.[118] He explained—based on his training and experience—that the "antenna" was a known smuggling corridor near Sells, Arizona, and that, when a phone is seized, law enforcement recommends that it be removed from any network, to ensure that information cannot be added or deleted remotely.[119] Agent Gomez provided a lay opinion when he testified over objection that, based on his involvement in the investigation, the text messages between Lares and Rodriguez about securing bank accounts for the deposit of $7000-$8000 appeared to be related to the April 8 event.[120] Agent Gomez provided another lay opinion when he said that Rodriguez and Lares were discussing hostage-taking when Rodriguez said "we're inviting ourselves" after

---

[117] 4-ER-558.
[118] 4-ER-556-91.
[119] 4-ER-608, 620.
[120] 4-ER-586-87, 596.

17

Lares sent a text about "six" being predicted at the antenna in about two hours and "more coming" in two or three more hours.[121] Agent Gomez went on to say that this was not related to ordinary alien smuggling, but to hostage taking, because the migrants there were already being smuggled.[122] The district court denied Lares's motion to strike the opinion that the messages referred to hostage taking.[123]

The government called Agent Nestor Claudio as an expert in alien smuggling operations and methods, including the different roles played by those working for the smuggling organization.[124] He said that most smuggling arrangements are made in the country of origin, and the price is set before the journey begins.[125] Migrants typically first travel to a border town in Mexico and wait in a guest house until their group receives permission to cross from the criminal organization that controls the area, to which they must pay a cash fee.[126] Then a guide will lead them across the border (unless they have made a deal to cross at a port of entry with false identification).[127] The guide takes them to a pick-up spot across the border, where a load driver retrieves them and takes them to the

---

[121] 4-ER-608-09; 5-ER-893 (lines 142-45).
[122] 4-ER-609.
[123] 1-ER-025-31, 4-ER-612-18.
[124] 4-ER-633.
[125] 4-ER-634-635.
[126] 4-ER-636-37.
[127] 4-ER-637-40.

next point in their journey.[128] Meanwhile, scouts stationed in the area monitor

Border Patrol activity.[129] The organizations typically use electronic applications

such as WhatsApp to provide the pick-up locations; the guide will share the

location with a higher-up, who will in turn share the location with the load

driver.[130] The roles are compartmentalized, with higher-ups providing participants

with information on a "need to know" basis.[131] The higher-ups and the load driver

agree on a set price for the transport before the driver embarks, and the driver is

not paid by the migrants at drop-off but is paid by the organization after

delivery.[132]

Agent Claudio also testified that, in alien smuggling and transportation

cases, payment is typically made in installments after the migrant crosses the

border and reaches certain points in the journey.[133] He also said the average

smuggling fee per person from Mexico is $8,000 to $15,000, depending on the

circumstances such as the journey's length.[134] And, because it is unsafe to carry

large sums of cash traveling through Mexico, migrants will typically ask a relative

or friend to wire the money or transfer it to a bank account provided by the alien

---

[128] 4-ER-642.
[129] 4-ER-644.
[130] 4-ER-646.
[131] 4-ER-646.
[132] 4-ER-649, 659, 688.
[133] 4-ER-653, 656.
[134] 4-ER-639, 640.

smuggling organization.[135]  But, Agent Claudio said, it is unusual for load drivers to be involved in obtaining accounts for the migrants' families to use for deposit.[136]

## H.    Jury Instructions

The district court instructed the jury on all of the charges presented at the trial: conspiracy to hostage take (count one), hostage taking (counts two and three), aiding and abetting liability for those offenses, conspiracy to transport aliens for profit (count four), and transportation of aliens for profit (counts five and six).[137] The instruction on conspiracy to hostage take did not explain that, to convict, the government had to prove beyond a reasonable doubt that Lares knew that *the crime of hostage taking* was the objective of the conspiracy that he joined.[138] And the court did not instruct the jury on how to evaluate the multifaceted nature of Agent Gomez's testimony.[139] (The district court did provide an expert witness instruction and a dual role instruction, but explicitly limited their application to two different witnesses, Agent Claudio as an expert witness, and Agent Hernandez as s a fact and opinion witness[140]).

---

[135] 4-ER-655-56.
[136] 4-ER-685.
[137] 2-ER-105-14.
[138] 2-ER-105.
[139] 4-ER-556-624; 2-ER-087.
[140] 2-ER-102-03.

## I.     Closing Arguments and Verdict

The government argued that the jury knew Lares was conspiring with Rodriguez because of the phone calls and text messages,[141] and it emphasized that Lares only needed to know of *one* object of the conspiracy to convict of conspiracy to hostage take.[142] The government noted that Lares knew where to pick up Portillo and Perez, apparently had received their phones when he picked them up at the house, and did not return those phones until the men were released from the black Hyundai.[143] The government also stressed that Lares arrived at the Home Depot parking lot before Rodriguez and Borboa, and that he concealed his face and did not release Portillo and Perez until after he received a phone call.[144] And the government stressed that Lares must have acted with the knowledge and intention to advance the conspiracy to hostage take, because he wanted to get paid and he located bank accounts to facilitate the migrants' payment before April 8 and forwarded them to Rodriguez.[145] The government urged the jurors to convict under the aiding and abetting theory even if they did not think Lares personally committed hostage-taking.[146]

---

[141] 5-ER-836, 840.
[142] 5-ER-834, 836.
[143] 5-ER-837-38.
[144] 5-ER-838, 845.
[145] 5-ER-839-41, 848.
[146] 5-ER-838-39.

21

The defense conceded that Lares conspired to commit and committed transportation of aliens for profit.[147] But counsel argued that the only way the jury could convict of hostage taking on an aiding and abetting theory was if the government proved that Lares knew Portillo and Perez were hostages when he picked them up on April 8, and that burden was unmet.[148] And, counsel said, Lares treated the men well and never threatened them or communicated in any manner that they were not free to leave the Hyundai.[149] Counsel recounted Agent Claudio's expert testimony that the use of bank accounts for payment deposits is common in all alien smuggling operations; it is not limited to hostage-taking situations.[150] And even if Rodriguez *did* want the accounts to receive payment for a kidnapping ransom, the government did not prove Lares knew of that purpose.[151] He simply drove Portillo and Perez from point A to point B, and as, Agent Claudio testified, higher-ups in a criminal organization typically do not inform load drivers about the details of the larger scheme.[152]

---

[147] 5-ER-856.
[148] 5-ER-860.
[149] 5-ER-861.
[150] 5-ER-863.
[151] 5-ER-864.
[152] 5-ER-862.

In rebuttal, the government urged that there was "only one object" for the hostage taking conspiracy: $16,000, and Lares "knew it and intended to help accomplish it."[153]

The jury convicted Lares of conspiracy to hostage take (count one), conspiracy to transport aliens for profit (count four), and transportation of aliens for profit (counts five and six).[154] But it acquitted him of hostage taking (counts two and three).[155]

## J.    Sentencing

Lares objected to the PSR's recommendation for a multiple-count adjustment for the hostage taking of two victims and a six-level enhancement for a ransom demand.[156] He argued those enhancements should not apply because the jury acquitted him of that conduct.[157]

The district court overruled his objections adopted the PSR's guideline calculation, with an advisory range of 360 months to life.[158] The court granted a downward variance and imposed a 216-month prison term for conspiracy to hostage-take (count one) and concurrent 120-month terms for the alien-

---

[153] 5-ER-868.
[154] 5-ER-884-86.
[155] 5-ER-885.
[156] 5-ER-912-13.
[157] 5-ER-912-13.
[158] 1-ER-034-35.

transportation convictions and the prohibited possession conviction (counts four, five, six, and seven), to be followed by 36 months of supervised release.[159] Borboa received a 168-month term of imprisonment.[160]

## SUMMARY OF ARGUMENT

### I.  Misleading Jury Instruction on Conspiracy to Hostage Take

A jury instruction that is misleading or inadequate to guide the jury's deliberations as to whether the government has met its burden of proof on every element of a charged crime violates due process. In the context of this case, the district court's instruction on conspiracy to hostage take was plainly misleading and violated due process because it did not convey that, to convict on that charge, the jury had to find that Lares knew that *hostage taking*—and not merely transportation of aliens for profit—was the object of the conspiracy that he joined. This Court should therefore reverse Lares's conviction on count one.

### II.  Improper Opinion Testimony

A law enforcement expert may not provide a lay opinion based on his knowledge of the case unless it rests on adequate foundation and is based on his own perceptions. Such an opinion is also inadmissible if it merely tells the jury what result to reach regarding the defendant's culpability, because lay opinions

---

[159] 1-ER-054-55; 5-ER-931.
[160] 5-ER-927.

24

must assist the trier of fact. Fed. R. Evid. 701. Additionally, when law enforcement experts testify in multifaceted roles, as here, the district court must provide an instruction to guide the jury's consideration of the witness's factual, expert, and lay opinion testimony. Here, Agent Gomez's lay opinion testimony lacked sufficient foundation and did not assist the trier fact. The district court also plainly erred in failing to give a multiple-role instruction. These errors require reversal of Lares's conviction on count one.

## III.    Unconstitutional Prohibited Possession Conviction

The federal felon-in-possession statute, 18 U.S.C. § 922(g)(1), is facially unconstitutional because the government cannot meet its burden to show a comparable permanent prohibition on firearm possession by felons at the time of Founding. Alternatively, it is unconstitutional as applied to Lares because his prior convictions were not for violent or dangerous offenses. His conviction on count seven should therefore be reversed.

## IV.    Use of Acquitted Conduct at Sentencing.

A district court's consideration of acquitted conduct at sentencing is barred by the Sixth Amendment. It circumvents the defendant's right to trial by jury. Here, Lares's advisory Guidelines range was increased based on conduct of which he was acquitted. Remand for resentencing is therefore required.

## ARGUMENT

I. **Lares's conviction for conspiracy to hostage take should be reversed because the district court's jury instruction on this offense was misleading and inadequate to guide the jury's deliberations.**

### *Material Facts*

The jury received the following instruction on the charge of conspiracy to hostage take, with emphasis added:

> The defendant is charged in Count One of the indictment with conspiring to hostage take in violation of Section 1203(a) of Title 18 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:
>
> First, beginning from an unknown date and up to and including April 8, 2022, there was an agreement *between two or more persons* to commit the crime of hostage taking (the elements of which are stated below); and
>
> Second, the defendant became a member of the conspiracy *knowing of at least one of its objects* and intending to help accomplish it.
>
> The elements of hostage taking are:
>
> First, a person intentionally seized or detained a victim;
>
> Second, a person threatened to kill, injure, or continue to detain that victim; and
>
> Third, a person did so with the purpose and intention of compelling a third person to act, or refrain from acting, in some way, as an explicit or implicit condition for the release of the seized or detained victim.

26

A victim is "seized" or "detained" when held or confined against his will by physical restraint, fear, or deception for an appreciable period of time.

The fact that the victim may initially agree to accompany the hostage taker does not prevent a later "seizure" or "detention."

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit *one or more crimes.* The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.
For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit *at least one of the crimes alleged in the indictment as an object of the conspiracy* with all of you agreeing as to the particular crime which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further *some object or purpose of the conspiracy*, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.[161]

A conspiracy may continue for a long period of time and may include the performance of many transactions. It is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members.

---

[161] 2-ER-105-07 (emphasis added).

Even though a defendant did not directly conspire with other conspirators in the overall scheme, a defendant has, in effect, agreed to participate in the conspiracy if the government proves each of the following beyond a reasonable doubt:

First, the defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy;

Second, the defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired; and

Third, the defendant had reason to believe that whatever benefits the defendant might get from the conspiracy were probably dependent upon the success of the entire venture.
It is not a defense that a person's participation in a conspiracy was minor or for a short period of time.[162]

The jury was also instructed on the other counts charged in the indictment, including hostage taking, conspiracy to transport illegal aliens for profit, and transportation of illegal aliens for profit.[163] The instructions allowed the jurors to convict Lares of conspiracy to hostage take or hostage taking if he aided or abetted those crimes by helping another person with respect to at least one element of the crime and acted with the intent to facilitate the crime.[164]

### *Standard of Review*

When defense counsel does not object to a jury instruction, this Court reviews for plain error. *United States v. Bear*, 439 F.3d 565, 568 (9th Cir. 2006).

---

[162] 2-ER-105-07.
[163] 2-ER-110-14.
[164] 2-ER-108-09.

To reverse under this standard, "there must be (1) error, (2) that is plain, and (3) that affects substantial rights." *Id.* (citations and internal alternations omitted). "If these three conditions are met [this Court] may exercise [its] discretion to reverse, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citations and internal alterations omitted). A plain error in jury instructions affects substantial rights and undermines the fairness and integrity of the proceedings when it creates "a genuine possibility that the jury convicted on a legally inadequate ground." *Bear*, 439 F.3d at 570. *See also United States v. Ornelas*, 906 F.3d at 1138, 1143 (9th Cir. 2018) (plain error affects substantial rights if there is "a reasonable probability that, but for the error, the outcome of the proceeding would have been different") (citation and internal alterations omitted); *United States v. Joseph*, 716 F.3d 1273, 1280 (9th Cir. 2013) (reasonable probability is less than a likelihood).

### A. The instruction did not convey the government's obligation to prove that Lares knew that hostage taking was the object of the conspiracy he joined, rather than merely making a profit through alien transportation.

The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every element of the charged crime. *In re Winship*, 397 U.S. 358, 364 (1970). A jury instruction is therefore infirm if it relieved the state of this burden regarding any element of the charged offense. *Medley v. Runnels*, 506 F.3d 857, 864 (9th Cir. 2007) (en banc). A jury instruction

"must be viewed in the context of the overall charge." *United States v. Dixon*, 201 F.3d 1223, 1230 (9th Cir. 2000); *see also United States v. Brooksby*, 668 F.2d 1102, 1104 (9th Cir. 1982) (quoting *Cupp v. Naughten*, 414 U.S. 141, 144, 146-47, (1973)). This Court evaluates a challenged jury instruction as the jury would, "with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson v. Texas*, 509 U.S. 350, 368 (1993) (citation omitted). "[T]he relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *Dixon*, 201 F.3d at 1230. If the jury instructions "as a whole [are] ambiguous, the question is whether there is a 'reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.'" *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (internal quotation marks omitted) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)).

To prove a conspiracy, as relevant here, the government must establish (1) an agreement to engage in criminal activity, and (2) the requisite intent for the substantive crime. *United States v. Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016). The government, therefore, must prove that the alleged conspirator possessed the same mens rea required for the commission of the substantive offense. *Ingram v. United States*, 360 U.S. 672, 678 (1959). The government also has the burden to prove beyond a reasonable doubt "that the defendant knew of his connection to the

30

*charged* conspiracy." *United States v. Meyers*, 847 F.2d 1408, 1413 (9th Cir. 1988) (citing *United States v. Federico*, 658 F.2d 1337, 1344 (9th Cir. 1981)). It must prove "that the defendant was aware of 'the unlawful object toward which the agreement [was] directed.'" *United States v. Grasso*, 724 F.3d 1077, 1086 (9th Cir. 2013) (quoting *United States v. Krasovich*, 819 F.2d 253, 255 (9th Cir. 1987)). *See also United States v. Warren*, 5 F.4th 1078, 1081 (9th Cir. 2021) ("It is axiomatic that, to be found guilty of a federal conspiracy, one must agree with at least one other person to commit a substantive federal offense . . . that is the object of the conspiracy."); *United States v. Tham*, 960 F.2d 1391, 1400 (9th Cir. 1991) (noting that a "conspiracy may have an object offense that is a violation of either criminal or civil law").

Therefore, to convict Lares of conspiracy to hostage take, the government had the burden to prove beyond a reasonable doubt that he knew that *hostage taking* was the object of the conspiracy he joined and that he acted with the intent that hostages be seized or detained for the purpose of compelling a third party to pay ransom as a condition of their release. But the convoluted jury instruction did not communicate to the jury that these findings were necessary, especially in light of the other charges and instructions.

The conspiracy-to-hostage-take instruction told the jury it could convict if the government proved (1) there was an agreement *between two or more persons to*

31

*commit the crime of hostage taking* (emphasis added), and (2) the defendant became a member of the conspiracy *knowing at least one of its objects* and intending to help accomplish it (emphasis added).[165] The jury was also instructed that a conspiracy is "an agreement of two or more persons *to commit one or more crimes*."[166] It was further told, "you must find there was a *plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy* with all of you agreeing as to the particular crime which the conspirators agreed to commit."[167]

This instruction was plainly confusing and inadequate for several reasons. First, it did not make clear that, to convict Lares of conspiracy to hostage take, the jury had to find that he knew that the *object* of the conspiracy was *to hostage take*. *See Grasso*, 724 F.3d at 1086. As written, the jury could have believed that it was sufficient to find that that two or more other people (e.g., Rodriguez and Borboa) agreed to commit the crime of hostage taking, that one of the objects of that conspiracy was to make a profit by transporting undocumented migrants, and that Lares merely knew of and conspired to commit *that* object of the conspiracy. That is conspiracy to commit transportation of aliens for profit, of which Lares concedes the jury correctly convicted him; it is not conspiracy to hostage take.

---

[165] 2-ER-105.
[166] 2-ER-105.
[167] 2-ER-106.

32

The conspiracy-to-hostage-take instruction created a genuine risk of confusion given the charges and instructions, as well as the government's argument. In addition to hostage taking, the indictment charged conspiracy to transport illegal aliens for profit and transportation of illegal aliens for profit.[168] Thus, the instruction that *a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy* was sufficient to convict on count one easily could have been misconstrued by jurors, because they were also instructed on those other transportation-related charges.

Moreover, in closing argument, the government heightened the risk of juror confusion by oversimplifying the elements of conspiracy to hostage take. The prosecutor emphasized that Lares only needed to know *one* object of the conspiracy to be convicted of conspiracy to hostage take.[169] Then, in rebuttal closing argument, the government told the jury there were only two elements to conspiracy to hostage take: "there was an agreement between two or more persons to commit the crime of hostage taking; and, second -- second is what relates specifically to this defendant -- the defendant became a member of the conspiracy knowing of at least one of its objects."[170] The government went on to say, "There

---

[168] 2-ER-112-15.
[169] 5-ER-834, 836.
[170] 5-ER-868.

33

was only one object, one object for this conspiracy, $16,000, and he knew it and he intended to help accomplish it. He was doing what he could to get the $16,000."[171]

The government was incorrect. The object of the conspiracy to hostage take charge was *hostage taking*, not getting $16,000 through alien smuggling, even though the instruction did not make that clear to the jury. As the government's own expert, Agent Claudio, told the jury, even in ordinary alien smuggling and transportation cases—where the migrants are *not* held hostage—payment is made *after* the migrant crosses the border and reaches certain points in the journey. For example, a portion of the payment is typically made at a midway point in Arizona and the rest after arrival at the final destination.[172] Agent Claudio also testified that the average smuggling fee per person from Mexico is $8,000 to $15,000, depending on the circumstances such as the journey's length.[173] And, because it is unsafe to carry large sums of cash traveling through Mexico, migrants will typically ask a relative or friend put the money in a bank account provided by the alien smuggling organization.[174]

So, contrary to the government's argument, Lares's involvement in finding bank accounts for migrants' relatives to use to make payments did not necessarily

---

[171] 5-ER-868.

[172] 4-ER-652, 656.

[173] 4-ER-639-40.

[174] 4-ER-655-57.

reflect his knowledge that Rodriguez, Borboa, or others were engaged in hostage taking or his intent to participate in a conspiracy to hostage take. And the $7000 to $8000 sum that Lares discussed with Ayon and Miranda was typical for garden variety, non-hostage-taking, alien smuggling.

The government also argued in closing that Lares must have knowingly participated in the conspiracy to hostage take because he picked up Portillo and Perez at the stash house, he was communicating with Rodriguez regarding where to take them and when to release them, and he did not give them their cell phones until he got the call that they should be released.[175] But, again, if the jurors were convinced that he did these things knowing of and intending to facilitate hostage taking, they would have convicted him of hostage taking under the aiding and abetting theory. All of these facts are also consistent with garden variety alien smuggling. And, while the government characterized Lares as "releasing" Portillo and Perez once he received a call from Rodriguez, what happened can also be characterized as Lares's simply telling them where to go (the blue Dodge Ram) once he learned from Rodriguez the next step for their journey. As Portillo testified, he and Perez did not feel that Lares was restraining them in any way. He left them alone in the black Hyundai.

---

[175] 5-ER-836-44.

The verdict itself casts substantial doubt on whether the jurors understood what the government had to prove to convict Lares of conspiracy to hostage take. The jurors acquitted Lares of the substantive offense of hostage taking,[176] even though they received an instruction on the aiding and abetting theory of liability, which allowed conviction upon proof that Lares aided another person with at least one element of conspiracy to hostage take, and/or hostage taking, with the intent to facilitate the offense.[177] If the jurors were convinced that Lares knew of the conspiracy to hostage take and intended to help accomplish it by finding bank accounts for ransom payment deposits or by transporting Portillo and Perez and holding their phones, as the government argued,[178] they would have convicted Lares of hostage taking under the aiding and abetting theory.

## B. The plainly erroneous jury instruction prejudiced Lares.

The district court plainly erred in providing an instruction on conspiracy to hostage take that did not require the jury to find that Lares knew that the object of the conspiracy he joined was *to hostage take*, rather than merely to make a profit by transporting aliens for a fee. This plain error impacted Lares's substantial rights. If properly instructed, the jury may well have harbored a reasonable doubt about

---

[176] 5-ER-885.

[177] 2-ER-108-09.

[178] 5-ER-840.

36

whether Lares committed conspiracy to hostage take, as it evinced by acquitting him of the substantive offense.

Therefore, it is reasonably probable that the district court's plain error impacted Lares's substantial rights and impugned the fairness and integrity of his trial. *Ornelas*, 906 F.3d at 1143; *Bear*, 439 F.3d at 570 (plain instructional error required reversal "because it created a genuine possibility that the jury convicted on a legally inadequate ground"). *See also Joseph*, 716 F.3d at 1280 (reasonable probability is less than likelihood). Indeed, in light of the acquittal of hostage taking under the aiding and abetting theory, it seems not just reasonably probable but likely the jurors would have acquitted of conspiracy to hostage take had they been apprised of the government's burden to prove Lares's knowledge that his alleged coconspirators were engaged in hostage taking. This Court should therefore vacate Lares's conviction for conspiracy to hostage take in count one.

## II. The district court's erroneous rulings on Agent Gomez's lay opinion testimony and its failure to give a multiple-role instruction to guide the jury's consideration of that testimony require reversal of the conspiracy-to-hostage-take conviction.

### *Material Facts*

On direct examination at trial, Agent Gomez, who became involved in the investigation *after* the April 8 incident,[179] provided fact testimony as well as both

---

[179] 4-ER-558.

expert and lay opinion testimony at trial. *See* pp. 17-18, *supra.* The government

established his training and experience in law enforcement at the outset of the

examination.[180] Agent Gomez testified over a defense foundation objection that the

discussions between Rodriguez and Lares on April 6-7 about account deposits in

the amount of $7,000 to $8,000 appeared to be related to the charged offense.[181]

And when asked whether it appeared that Lares understood what Rodriguez was

talking about in those messages, he said, "[Lares] knew very well what

[Rodriguez] was talking about."[182] When defense counsel sought to clarify the

matter on cross-examination, Agent Gomez reiterated that the monies appeared to

be related "in context, time, and amount."[183] Defense counsel asked, "You're

speculating on that?"[184] Agent Gomez merely repeated his answer.[185]

Defense counsel later asked, "In all of these messages between [Lares] and

[Rodriguez], they never discussed, quote 'hostages,' correct?"[186] Agent Gomez did

not answer that question, but instead gave the following opinion:

> So I feel that there is a discussion of stealing another load, a load of
> illegal aliens from another, another group. So essentially, they're
> saying they're inviting themselves to an area that is common for
> smuggling, that is a popular corridor. They speak of an area called the

---

[180] 4-ER-556-57.

[181] 1-ER-003-04; 4-ER-586-87.

[182] 4-ER-569.

[183] 1-ER-008-09; 4-ER-595-96.

[184] 1-ER-011; 4-ER-598.

[185] 1-ER-011; 4-ER-598.

[186] 1-ER-021; 4-ER-608.

> antenna. So the antenna, based on my consultations with agents in the Sells [, Arizona] area, is a common term for a smuggling corridor there. And so they're familiar that alien loads go through the antenna, and they discuss inviting themselves to there to collect aliens.[187]

Defense counsel sought to rein in this nonresponsive answer by asking, "For the purpose of smuggling, correct?"[188] Agent Gomez testified:

> I would say not for the purposes of smuggling because they're already being smuggled. So they're inviting themselves there to take over the alien loads and profit from that by collecting ransom from the families.[189]

Defense counsel moved to strike Agent Gomez's interpretation on grounds that is was speculative, misleading, and unfairly prejudicial.[190] The district court denied the motion.[191]

### *Legal Standards*

This Court reviews evidentiary rulings on opinion testimony for an abuse of discretion. *United States v. Kevin Freeman*, 498 F.3d 893, 901 (9th Cir. 2007). A witness who is qualified as an expert by knowledge, experience, training, or education may testify in the form of an opinion if the expert's specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, the testimony is based on sufficient facts or data, the testimony is the

---

[187] 1-ER-021-22; 4-ER-608-09. *See also* 5-ER-893 (lines 142-145).
[188] 1-ER-022; 4-ER-609.
[189] 1-ER-022; 4-ER-609.
[190] 1-ER-25-28; 4-ER-612-15.
[191] 1-ER-30; 4-ER-617.

product of reliable principles and methods, and the expert has reasonably applied the principles and methods to the facts of the case. Fed. R. Evid. 702; *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). If a witness is not testifying as an expert, testimony in the form of an opinion must be "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701. Even relevant evidence is inadmissible if its prejudicial value is substantially outweighed by the danger of unfair prejudice or confusion of the issues. Fed. R. Evid. 403.

Accordingly, although lay or expert witnesses may offer opinions interpreting ambiguous statements if the requirements of Rules 701 or 702 are otherwise satisfied, "the interpretation of *clear* statements is not permissible, and is barred by the helpfulness requirement of both [Rule] 701 and [Rule] 702." *Kevin Freeman*, 498 F.3d at 905 (quoting *United States v. Dicker*, 853 F.2d 1103, 1108-09 (3d Cir. 1988) (emphasis in original); *see also Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986) (noting that Rule 702 "makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance").

40

In addition, lay and expert witnesses may not offer opinions based on mere speculation. *Kevin Freeman*, 498 F.3d at 903-04.

Any lay opinion about the meaning of ambiguous statements must be "rationally based on the perception of the witness," *id.* at 902 (citing Fed. R. Evid. 701), such as when he is a direct participant in the conversations or directly perceives the conversation as it is occurring. *Id.* at 904-05. In other words, an agent may not "spoon-feed his interpretations of phone calls and the government's theory of the case to the jury, by interpreting . . . ordinary English language." *United States v. Freeman (Marcus Freeman)*, 730 F.3d 590, 597 (6th Cir. 2013) (cleaned up) (cited with approval in *United States v. Gadson*, 763 F.3d 1189, 1208 (9th Cir. 2014)). Simply put, "[a] witness, lay or expert, may not form conclusions for a jury that they are competent to reach on their own." *Marcus Freeman*, 730 F.3d at 597 (citation omitted). That is because, to be admissible, opinion testimony must assist the trier of fact. *Gadson*, 763 F.3d at 1206; Fed. R. Evid 701, 702.

Moreover, both expert and lay opinions must rest on an adequate foundation. *Gadson*, 763 F.3d at 1209-10; Fed. R. Evid. 701, 702. To lay an appropriate foundation for an agent's opinion based on his knowledge of a criminal investigation, the government must establish the extent of the agent's participation in that investigation, so that the jury can evaluate the weight to give to the opinion. *Marcus Freeman*, 730 F.3d at 597. To properly evaluate the evidence, the jury

41

must understand "what experience [the agent] had that the jurors themselves did not have." *Id*. Without knowing the extent of the agent's investigative role, it is impossible for the court to determine whether the agent's interpretation is based on his own perception, rather than on improper grounds such as speculation and hearsay. *Gadson*, 763 F.3d at 1207, 1209-10. "Judicial scrutiny of a law-enforcement witness's purported basis for lay opinion is especially important because of the risk that the jury will defer to the officer's superior knowledge of the case and past experiences with similar crimes." *United States v. Hampton*, 718 F.3d 978, 981-82 (D.C. Cir. 2013).

This Court has held that, provided there is a sufficient foundation on other grounds, an agent may interpret a recorded conversation, even if he did not himself participate in the conversation or perceive it as it was occurring. *Gadson*, 763 F.3d at 1209. But there is a circuit split on this issue. *See Hampton*, 718 F.3d at 981-83 (holding that a district court erred in allowing an agent to testify about intercepted conversations, despite foundational testimony that the agent had been in charge of the investigation, monitored wiretaps and supervised other agents who did so, performed physical surveillance, and reviewed all 20,000 conversations intercepted by the wiretaps.); *United States v. Grinage*, 390 F.3d 746, 750-51 (2d Cir. 2004) (agent may not offer opinion based on evidence that is not before the jury).

42

This Court has similarly held that, provided there is sufficient foundation, law enforcement witnesses may offer opinions about the meaning of ambiguous statements, even if plain language is used in those statements. *Gadson*, 763 F.3d at 1210-11 (citing *Kevin Freeman*, 498 F.3d at 900, 902). There is also a circuit split on this issue. *See Grinage*, 390 F.3d at 748-49, 750-51 (agent may not interpret phone calls beyond providing definitional information for opaque coded language; inappropriate for a law enforcement witness to tell jurors "what inferences to draw from" evidence); *United States v. Peoples*, 250 F.3d 630, 639-40 (8th Cir. 2001) (agent may only define coded language, not "plain English words and phrases").

Lastly, when a law enforcement witness provides multifaceted testimony, the district court must instruct the jury on how to evaluate the testimony given in each role. *United States v. Holguin*, 51 F. 4th 841, 864 (9th Cir. 2022), *cert denied* (citing *United States v. Rodriguez*, 971 F.3d 1005, 1018 (9th Cir. 2020)). Failure to do so is plain error. *United States v. Vera*, 770 F.3d 1232, 1246 (9th Cir. 2014). Such an instruction is crucial to ensure that the jury does not give undue deference to an agent's lay opinion based on his specialized experienced, training, and education. *See* Ninth Circuit Model Criminal Jury Instruction 3.15 (March 2023); *Hampton*, 718 F.3d at 981-82 (noting the risk that jurors will unduly defer to law enforcement testimony).

### A. Agent Gomez provided opinions lacking in foundation that improperly told the jury to view the evidence in keeping with the government's theory of the case.

Here, Agent Gomez provided improper lay opinions when he testified that the text messages about the account information appeared to be related in context, time, and amount to the charged offenses; that Lares knew "very well" what Rodriguez was talking about; and that Rodriguez and Lares were discussing hostage taking when Rodriguez said "we're inviting ourselves" in the midst of a discussion about migrants at the "antenna" area. It was appropriate for Gomez to provide testimony about what the "antenna" means. As he explained, he had specialized knowledge based on his experience and consultations with local law enforcement, presumably not only in this case but many others, that this term referred to a popular alien smuggling corridor near Sells, Arizona. This specialized knowledge helped the jury understand the meaning of the text message. This was not lay opinion testimony, because it was not based on Agent Gomez's perceptions, but rather on his experience, training, and education. But the rest of Agent Gomez's opinion testimony addressed here was inadmissible.

*First*, Agent's Gomez's testimony describing his involvement in the investigation did not establish proper foundation for the lay opinions he offered. His testimony merely established that he became a co-case agent *after the* April 8th sting, and that he assisted with Spanish translations and reviewed messages

extracted from Borboa's and Lares's phones.[192] (Notwithstanding Agent Gomez's Spanish fluency, a certified court interpreter translated the messages in the exhibits he discussed.[193]) Therefore, the record did not establish that his capacity to interpret the messages was any greater than that of the jurors, provided they were translated into English. *Gadson*, 763 F.3d at 1207-10; *Marcus Freeman*, 730 F.3d at 597. As a co-case agent, Agent Gomez surely did more than merely review the data extracted from the phones, but neither the district court nor the jury was apprised of the extent of his investigative involvement, and thus neither could "independently assess" the basis of his opinions. *Hampton*, 718 F.3d at 981-82. This lack of foundation presented a risk that the jury would unduly defer to Agent's Gomez's experience and training as a law enforcement officer. *Holguin*, 51 F.4th at 865-66.

*Second*, when Agent Gomez interpreted "we're inviting ourselves" as referring to hostage taking, he was effectively telling the jury what inferences to draw from plain language. He did not testify that those words had a peculiar meaning based on either his knowledge of the case or his training and experience in smuggling organizations. Absent a proper foundation, his speculative interpretation was an improper opinion. *Gadson*, 763 F.3d at 1207-10. It was also

---

[192] 4-ER-558-66.
[193] 4-ER-565-66.

improper because he was "spoon-feeding" the government's theory of the case to the jury when the jury was equally capable of interpreting the plain language for itself. *Marcus Freeman*, 730 F.3d 590, 597; *Grinage,* 390 F.3d at 748-49, 750-51; *Peoples*, 250 F.3d 630, 639-40. Lares acknowledges that this Circuit has held that such spoon-feeding is acceptable, if coupled with sufficient foundation. *Gadson*, 763 F.3d at 1210-11 (citing *Kevin Freeman*, 498 F.3d at 900, 902). But Lares maintains that the other circuits' interpretation accords with the language and intent of Rule 701, and he raises this argument to preserve it for *en banc* or Supreme Court review.

*Third*, Lares maintains that Agent Gomez's lay opinions interpreting the messages were improper because he was not directly involved in the conversations, nor did he directly perceive them as they were occurring. Because his opinions were not "rationally based on [his] perception," they plainly violated Rule 701(a). Again, Lares acknowledges that this Court has held otherwise, but preserves this issue for higher review. *Gadson*, 763 F.3d at 1209.

In addition, even if Agent Gomez's lay opinion testimony was admissible under Rule 701, it should have been excluded under Federal Rule of Evidence 403. Any probative value was substantially outweighed by the danger of undue prejudice and misleading the jury. The exhibit containing the relevant text

messages was admitted.[194] Because of Agent's Gomez's status as a co-case agent, the jurors might have mistakenly believed that his interpretation of the messages was superior to their own and should be adopted, which would result in unfair prejudice to Lares.

The district court therefore erred when it overruled Lares's foundation objection to Agent Gomez's opinion that the text messages about the accounts were related to the charged offenses, and when it denied his motion to strike Agent's Gomez's opinion that Rodriguez's use of the phrase "we're inviting ourselves" referred to hostage-taking.

Finally, the district court plainly erred in failing to instruct the jury about how to evaluate the different dimensions of Agent Gomez's testimony as an expert, fact witness, and lay opinion witness. *Rodriguez*, 971 F.3d at 1018; *Vera*, 770 F.3d at 1246.

### B. The errors prejudiced Lares.

As explained in Argument I, the jury's acquittal of Lares of hostage taking—even when it received an explicit instruction on aiding and abetting liability—strongly suggests that it was not convinced beyond a reasonable doubt that Lares knew about the conspiracy to hostage take. But it is possible the jurors' verdict reflected a compromise. They may have decided that Lares knew about the hostage

---

[194] 4-ER-563; 5-ER-890.

taking and was guilty of conspiracy to hostage take by a slim reed, but that his role was so limited that he deserved a break.

In light of the latter possibility, the government cannot meet its burden to show that the preserved errors were harmless. *United States v. Sandoval–Gonzalez*, 642 F.3d 717, 725 (9th Cir. 2011) (government must show it is more probable than not that a non-constitutional error did not materially affect the verdict). And, in any event, there is at least a reasonable probability that all of the erroneously admitted opinions, along with the failure to give a guiding instruction on the multifaceted nature of Gomez's testimony, impacted the verdict. *Ornelas*, 906 F.3d at 1143 (plain error requires reversal when defendant shows reasonable probability of a different result).

The key issue in this case was whether Lares knew that hostage taking, rather than merely transportation of aliens for profit, was an object of the conspiracy he joined. Agent Gomez's opinion that Rodriguez was referring to hostage-taking when he said "we're inviting ourselves" struck at the heart of that issue. And his opinions that the messages regarding the bank accounts were related to the charged offense, and that Lares "knew very well" what Rodriguez was talking about, exacerbated the prejudice. These opinions conveyed that Lares was completely in cahoots with Rodriguez and understood exactly what he was talking about in the text messages.

48

Even though this circuit provides more leeway for law-enforcement lay-opinion testimony than other circuits, it agrees, as it must in light of Rule 701's plain language, that opinions that "merely tell[] the jury what result to reach as to the defendants' culpability" are improper. *Gadson*, 763 F.3d at 1207-08 (citing Fed. R. Evid. 701 and *United States v. Rollins*, 544 F.3d 820, 833 (7th Cir. 2008)). That is all Agent Gomez did when he rendered these improper, unfounded lay opinions. The district court's failure to give an appropriate multifaceted-witness-role instruction heightened the risk that the jury would give undue weight to Agent Gomez's testimony. As the errors struck at the core of Lares's defense—that he conspired to commit and committed the offense of transportation of aliens for profit but knew nothing about the hostage-taking scheme—they require reversal. *See United States v. Esparza*, 791 F.3d 1067, 1074 (9th Cir. 2015) (reversal required when improper evidence went to heart of defense).

## III. Lares's conviction for prohibited possession by a felon must be vacated because the statute is unconstitutional.

Lares pleaded guilty to count seven, which charged that he was a felon in possession of a firearm in violation of 18 U.S.C. 922(g)(1). In *Class v. United States*, the Supreme Court held that a "valid guilty plea does not, by itself, bar direct appeal of [a person's] constitutional claims [.]" 583 U.S. 174, 182 (2018). Just like in *Class*, Lares's "constitutional claims here…do not contradict the terms

of the indictment [and] are consistent with [his] knowing, voluntary, and intelligent admission that he did what the indictment alleged." *Id.* at 181.

"Recently . . . in [*New York Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022)], the Supreme Court considered the meaning of the Second Amendment and articulated an analytical framework to determine whether a firearm regulation is constitutional." *United States v. Prince*, No. 22 CR 240, 2023 WL 7220127, at *2 (N.D. Ill. Nov. 2, 2023). It held that:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. When the Second Amendment's plain text protects certain conduct, the government can regulate such conduct only if it can "affirmatively *prove* that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. (Emphasis added). Otherwise, the court must conclude that the individual's firearm-related conduct is protected because it falls within the Second Amendment's "unqualified command." *Id.* at 2126 (internal quotations omitted).

*Id.* at *2.

The government cannot meet "its burden to prove that felons are excluded from 'the people' whose firearm possession is presumptively protected by the plain text of the Second Amendment." *Id.* at *5. And even if the government could show that "the text, history, and tradition of firearm-dispossession statutes demonstrates that the legislature has the authority to categorically regulate firearm possession by individuals who have demonstrated that they cannot be trusted to obey the law, or pose some other danger to the political community if armed," it cannot show

"evidence of a dispossession statute with a 'comparable burden'" to § 922(g)(1).
*Id.* at *8 (citing *Bruen*, 142 S. Ct. at 2133).

There is no evidence of any law at the time of the Founding or the
ratification of the Second Amendment categorically prohibiting possession of
firearms by individuals with felony convictions. *Id.* at *6. Many serious offenses
were not punishable by death or life imprisonment, and even if offenders were
stripped of their estate when convicted, they could presumably purchase firearms
after successfully serving their sentences. *Id.* at *10 (citing *Range v. Att'y General
of the U.S.*, 69 F.4th 96, 127-28 (3d Cir. 2023) (en banc) (Judge Krause,
dissenting).

Even though the American colonies disarmed certain groups—including
Catholics, enslaved persons, and Native Americans—"individuals within these
groups could possess firearms under certain circumstances," such as if they swore
allegiance to the sovereign or obtained permission from their owners. *Id*. at *7. The
government cannot show "even a 'relevantly similar' historical analogue to
§ 922(g)(1)'s *permanent* prohibition on firearm possession by felons, which can be
lifted only by expungement, federal pardon, or other method of restoring civil
rights that lifts the underlying offense from a 'conviction' under § 922(g)." *Id.* at
*8.

Therefore, 18 U.S.C. § 922(g)(1) is facially unconstitutional. *Id.* at *11.

Alternatively, the statute is unconstitutional as applied to Lares, because he had not

been convicted of a violent or dangerous offense. *See Range*, 69 F.4th at 106

(statute unconstitutional as applied to a defendant convicted of the felony-

equivalent state offense of making a false statement to obtain food stamp

assistance); *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL

4232309, at *30 (S.D. Miss. June 28, 2023) (statute unconstitutional as applied to

defendant who completed sentence for aggravated assault and manslaughter fifteen

years ago).

Lares did not raise this issue below. He concedes for purposes of this appeal

that he cannot meet his burden on plain error review at the time of this filing. He

raises the issue to preserve it in the event that this Court or the Supreme Court

issues an opinion that could allow Lares to meet his burden on plain error during

the pendency of this appeal. *See Garland v. Range*, No. 23-374,

https://www.supremecourt.gov (petition for certiorari filed October 5, 2023).

## IV.   Remand for resentencing is required because the district court imposed sentencing enhancements based on acquitted conduct.

The PSR recommended a two-level upward adjustment under U.S.S.G.

§ 3D1.4 to reflect that there were two victims of the hostage-taking conspiracy.[195]

---

[195] PSR ¶ 49.

It recommended a six-level enhancement for each group because a ransom demand was made for the release of each victim. U.S.S.G. § 2A4.1(b)(1).[196] These recommendations resulted in an advisory Guidelines range of 360 months to life (offense level 40, criminal history category IV).[197] Otherwise, the advisory range would have been 168-210 months. U.S.S.G. Sentencing Table (2018). Lares objected on grounds that it was improper and unjust to so increase the advisory Guidelines range, because the jury had acquitted him of taking the victims hostage and there was no evidence that he was involved in demanding ransom.[198] The district court overruled his objections.[199]

Constitutional issues are reviewed de novo. *United States v. Alahmedalabdaloklah*, 76 F.4th 1183, 1238 (9th Cir. 2023). The Sixth Amendment guarantees the right to trial by jury. U.S. Const. amend. VI. It preserves the jury's role as a bulwark between the government and the accused. *S. Union Co. v. United States*, 567 U.S. 343, 350 (2012). The finality of a jury's acquittal is "unassailable." *Yeager v. United States*, 557 U.S. 110, 122-23 (2009). Therefore, a district court's use of acquitted conduct to increase a defendant's sentence violates the Sixth Amendment. Lares acknowledges this Court has rejected this argument.

---

[196] PSR ¶¶ 35, 42.
[197] PSR at p. 19.
[198] 5-ER-912-14
[199] 5-ER-034.

*United States v. Mercado*, 474 F.3d 654, 656 (9th Cir. 2007) (citing *United States v. Watts,* 519 U.S. 148 (1997) (per curiam)). He raises it to preserve the issue for higher review.

## CONCLUSION

For the foregoing reasons, this Court should vacate Lares's conviction for conspiracy to hostage take. Alternatively, it should remand for resentencing.

Dated this 9th day of January, 2024.

JON M. SANDS
Federal Public Defender

*S/ M. EDITH CUNNINGHAM*
M. EDITH CUNNINGHAM
Assistant Federal Public Defender

## STATEMENT OF RELATED CASES

Counsel is not aware of any related cases.

Dated this 9th day of January, 2024.

> JON M. SANDS
> Federal Public Defender
>
> *S/ M. EDITH CUNNINGHAM*
> M. EDITH CUNNINGHAM
> Assistant Federal Public Defender

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number**

I am the attorney or self-represented party.

**This brief contains 11,352 words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

X  This brief complies with the word limit of Cir. R. 32-1.

☐  is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

☐  is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐  is for a death penalty case and complies with the word limit of Cir. R. 32-4.

☐  complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

   ☐  it is a joint brief submitted by separately represented parties;
   ☐  a party or parties are filing a single brief in response to multiple briefs; or
   ☐  a party or parties are filing a single brief in response to a longer joint brief.

☐  complies with the length limit designated by court order dated           .

☐  is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Dated: January 9, 2024                    *s/ M. Edith Cunningham*
                                          M. Edith Cunningham

56